Disabledinactionof PA v SEPTA Mr. Gold Good morning, Your Honor. May it please the Court, I would like to reserve two minutes. With me is Co-Counsel Rocco Iacollo from the Disability Rights Network and also at the podium table is a representative from the Department of Justice who is acknowledging for an amicus brief. Go ahead. This case involves one of the most important components of the Americans with Disabilities Act, the elimination of architectural barriers so people with disabilities will gain equal access to services and programs and have the same opportunity to use those programs and facilities as non-disabled people. To achieve that end, Congress required an incremental approach Public entities were only responsible for making accessibility if either new construction occurs or an alteration occurs. Without those two, there's no legal duty involved. In the present case, it's really important for the Court to understand there is no disagreement about the following. Plaintiff filed their case within two years of the completion of the 15th and Market Street entrance to the subway. No question. Plaintiff filed a fourth amended complaint within two years of the completion of the City Hall escalator replacement. That's not in dispute. There is no disagreement either that in the 15th and Market Street that there was a new stairway constructed replacing the existing one nor is there a dispute that there was a new escalator replacing the existing one. As obviously the Court knows, Plaintiff's lost on a statute of limitations claim and that's what we're here for today. Just other context. These are probably the two busiest stations in the Philadelphia system in terms of the Broad Street subway and the Frankfort L. The lower court error for a number of reasons and we're not going to focus only on a few. The brief deals with all of them. The first one is that the ADA requires actual disparate treatment. Not anticipated disparate treatment. Not hypothetical disparate treatment. But actual disparate treatment. And until there is completion of construction neither non-disabled people could have used the 15th and Market nor disabled. And therefore you don't have disparate treatment until it's completed. Second, upon completion it's only upon completion that discrimination occurs. Discrimination requires a legal injury. And that occurs only when people with disabilities cannot gain the same access assuming reconstruction or an alteration. How do you get around Chardon versus Fernandez? Chardon was... That was an opponent case. Yes. Let me... We get around because as Justice Alito said last year it was a different statute. The discrimination was different. It's different from Title VII employment when you're talking about employment practice versus a construction under the ADA. These are two different types of discrimination. They occur at different times and they're different. Period. And we're asking you to look at the ADA statute in this case which clearly, clearly defines the following. But you have to use a federal discovery rule. Absolutely. The federal discovery rule and in this case the federal discovery rule is controlled by this circuit by Judge Cherdoff's decision in the CGP occupancy therapy where he said for this circuit unequivocally that the occupancy rule does not accelerate the statute of limitation period. I thought it was controlled by the opinion of Romero versus Allstate. No. With all due respect, I thought it's the CGP occupancy case where he is unequivocal. He gives in a footnote the hypothetical that is exactly our situation where he says, let me remind you, that a tort of trespass has not occurred until the victim's property is entered by the tortfeasor that the victim was informed in advance of the inevitability does not alter the approval of the damages for the action. That's exactly the same thing here. Let me make sure... Mr. Gold, you say it's a different statute in response to Judge Fisher's question, but in your brief you rely heavily by analogy to the Fair Housing Act. Why isn't that a different statute? It refers to design and construction and in the statute we are interpreting does not refer to design and construction. That is correct, Your Honor. And we think this case is even stronger because under the Fair Housing cases, if someone sees design in the current that is not going to result in an accessible feature, that's an injury. Because Congress defined that as an injury, the design and construction. Assuming you can parse design from construction and read it disjunctively rather than conjunctively. In this case, you only have construction. You only have that the discrimination occurs and it's really important to understand this specific section of the statute of the ADA. It requires two things. It requires, first, that the actual alterations, one, affect or could affect accessibility and that, two, that the failure to make such alterations, the failure upon completion, when it is not accessible for people who use wheelchairs, that's discrimination. And that's what Congress has said and all we're asking this court to do is apply that statute. Yeah, but what sense does it make as a matter of policy? And I think there's a whole host of things that we need to look at here in trying to determine what Congress said. First of all, it's the statute itself. But I think it's not unequivocal as to what is said in that statute. But why does it make sense that, particularly in this case with Suburban Street Station, you knew when the city granted the variance that they were going to go ahead with construction of the escalator and the stairs at the Suburban Street Station. Suburban Street or 15th and Market? 15th and Market. And we're not going to install an elevator. Yes. Why doesn't it make sense that what Congress would have anticipated was that if there was to be a challenge by those who knew, and your clients knew, that the challenge should have been made then? Okay, first of all, Your Honor, most quote-unquote know that we had an oral agreement that the same counsel who was involved in Sykes, the Sykes decision, and I had an agreement that represented the city and there's a stipulation where they stated that they knew they were in violation. And the only way they got around it was we agreed that they could move the elevator from the northwest corner, and this was the oral agreement, with SEPTA and the city, from the northwest corner of 15th and Market to the northeast, to the Dilworth Plaza, which is what they wanted to do. And we said, fine. The clients said it's a little budge on the ADA, but we can live with that compromise. And it was only, only, when they reneged on that agreement that we then realized, wait a minute, we're getting screwed galore on this one. We're going to go on the court on the one that we know we can win, the northwest corner of 15th and Market. But there was an agreement. In retrospect, where did I blow it? I should have gone, I should have, with that oral agreement, these are people I've worked with for 10 to 20 years with the oral agreement. I should have done what the Department of Justice does routinely. File one paragraph consent decree, have one of the district judges here, you know, sign it, and premature it, and then it would have been all over. But the bottom line is it doesn't matter. The bottom line is that the statute requires, requires that upon completion, that facility is accessible. That's the only time you get disparate impact. Let me put it this way. Your friend across the way says Congress couldn't possibly have intended to put us in the situation that the plaintiffs in this case are putting us. That is that we have got to irrevocably spend millions and millions of dollared monies before finding out whether or not what we're trying to do technically complies with the law. Now, what do you say to that? Aren't they under your construction? Aren't they in an impossible position? Well, in this circuit, Judge, where Judge Manson's decision sucks, they knew they had to build one like that. And that they opted, they made the decision not to do it. And then after they made that decision, when we wrote for them, they said, oops, you're right, we made a mistake. How about instead of putting it on the northwest corner, we move it across the street? Look, we've got to interpret this statute not just to fit this case, but to make sense across the country. We agree. I don't know how I'm answering my question. What is somebody in their position going to do under your construction of the statute? They're going to make the place accessible. If they're going to what? When they do alterations or new construction, as this circuit on two previous occasions has instructed, that is the time that Congress said make the facility accessible. They knew it. This circuit has instructed them to do it. And Congress has made it. There was no question. They took a chance. They should have done it. They should have made it accessible. That's the bottom line. Otherwise, Judge, we will never, ever... There can never be a dispute about whether you've accomplished equal accessibility or not? No, there can be a dispute on the following. The dispute is whether when they move, whether the alterations that they made affect usability. And they put new stairs and see sights. It's the exact same thing. And an escalator. So that was a question. And the second question is whether when they're completed, that people in wheelchairs actually have accessibility to it. That's the statutory standard. That was the standard more than 20 years ago on their previous statutes. There is no question. They should have done it. They took a chance. They could have also come in here, Judge, and asked for a declaratory judgment, which they opted not to do. They could have come in here and said, geez, we're not sure. You know, this is what we're going to do. District Judge, tell us whether you think this complies with sex or not and Jerusalem, in terms of alterations. And then they would know. The reason they didn't do that is because of the agreement that was reached. They realized, and the city stipulations clearly says it, that they don't get a variance except for that agreement. Because the city knew when the construction was being done, that would violate sex. So they took a chance. I made a mistake by not really forcing the issue in writing, but they took a chance. And the legal standard we want this court to do is to say, clearly, Congress was not, when they talked about upon completion, Judge Hardiman, wasn't telling construction, the public facilities, that this is a construction schedule. They were saying, that's when it has to be done. That's when the injury occurs. There is no injury before that. Why didn't you frame your argument that when they reneged on the agreement, it was only then that your clients knew that they weren't going to have an accessible facility? Because I didn't think any district judge would have to look at the statute, would have to parse that, and would have to say, do they have to do it anyhow? And that just an oral agreement in terms of a contract claim was not going to arise in the district judge to make them put it in an elevator. Period. So you're going to have to get to the bottom, the district judge was going to have to get to the bottom line anyhow, whether that alterations triggered it. All right, Mr. Gold, why don't we hear from Mr. Friel on behalf of the amicus. I'll hand you back, Kev. Thank you, Bob. May it please the court, my name is Gregory Friel from the Department of Justice representing the amicus United States. The government's position is that the statute of limitations on this 12-1-2-1-4-7-A claim does not begin to run at the earliest until the public entity has completed the alterations in question. We believe that interpretation is compelled by the statutory language. And I think it's very important to focus on the fact that section 12-1-4-7-A is a definitional provision. It defines a type of discrimination prohibited by 42 U.S.C. 12-1-3-2 and by section 504 of the Rehabilitation Act. So I think looking at the language of those two provisions will help inform this court about the proper interpretation of 12-1-4-7. And those two provisions provide that no individual with a disability, by reason of disability, shall be subjected to discrimination by a public entity. And section 504 essentially has equivalent language. And so really the focus of that language is whether the individual with a disability has suffered discrimination. And in our view, no one will suffer discrimination related to the alterations of a public transportation facility while the portion of the facility being altered is under renovation. Because as a practical matter, when we're talking about these types of renovations, that portion will be closed to the public for safety reasons related to construction. So during that period, no one, either a person who has no disability or an individual with a disability, is going to be able to have access to the portion under construction. Our view is certainly no one, an individual with a disability under those circumstances, is being subjected to discrimination. And yet, under the district court's ruling, the court has adopted interpretation under which a statute of limitations could begin to run long before an individual with a disability could suffer any discrimination related to the alteration. So I think the fact this is a definitional provision is highly significant here. And as we pointed out in the brief, we also believe that, just sort of as a matter of common English usage of the English language, that the failure language also supports this reading. Because the statute provides that when certain... It doesn't require... This particular statute does not require alterations to be made. It provides that if the public entity decides to make the alterations, then it is discrimination to fail to make such alterations in a way that results in the altered portions being readily accessible. And it seems to me that the most natural reading of that language is that no such failure really occurs until the altered portions of the facility... If the altered portions of the facility are accessible by the time of the completion. This is not like going on and painting the facility where you have a can of paint. It is not? You sort of decide which part you're going to paint and how you're going to put the strokes on. That's a construction project where you've got to plan it. You've got to bid it. You've got to get the equipment. You have to get the personnel. I mean, when you make your decision that you are or are not going to have an elevator, it's a pretty final decision as to that project, is it not? I think it is in this situation, certainly. The Justice Department's concern is that most likely this court's opinion is going to be written so that it doesn't carve out elevator projects and is going to apply more generally. And I can say the government's experience in enforcing these statutes indicate that in many types of construction and alterations projects, the designs are much more fluid. They are in flux well into the construction project where things are changed. There's an opportunity to influence the ultimate design of the facility. So we are also concerned that under the district court's ruling, it could trigger unnecessary litigation where an entity says, well, I plan to do this project this way. And it's the type of alteration where that may evolve during the process. And then you'll have some people will say, well, we're not sure whether that's concrete enough to file suit. So to err on the side of caution, we'll bring a suit. And I think this will end up getting courts potentially bogged down in lots of difficult questions about likeness issues and so forth. No matter which way we go, there's a risk of increased litigation. There is, but my sense is that the increase is greater looking overall at the types of alterations that would be covered if the court were to affirm the district court judgment. The plaintiff in this case is seeking an injunction. And I think you recognize in your brief that a suit for an injunction can be brought before completion, assuming you can show an imminent and definite threat. Yes. Does laches have anything, any application here? They're saying you knew and you unreasonably delayed. And in the meanwhile, we spent X millions of dollars that is not going to do the public any good anymore. No, I quite honestly haven't researched the laches issue to know whether to apply in this particular case. I want to emphasize that our position is not intended to foreclose courts from adopting traditional equitable principles like laches, estoppel, clean hands doctrine and so forth that might inform the scope of the appropriate remedy in a particular case. And I certainly think those could be relevant factors and I don't mean to say that laches or those equitable doctrines could not be invoked. Okay. If the court has no more questions... Thank you, Mr. Freeland. We thank you for appearing on this matter. Thank you for your honor. It's the benefits of the Department of Justice's views. Thank you. Mr. Krenzel. Thank you. Good morning, your honors. Good morning. May it please the court. My name is Saul Krenzel and I represent SEPT in this matter. Just to clear a few things. The statement that there was an oral agreement was stipulated out of the case and the judge below found that there was no reason to equitably toll the statute of limitations. That's number one. The second statement which was there would be no access but for alterations or perhaps new stations is incorrect. SEPTA has billed out and retrofitted 36 key stations just like every other authority has to do under the particular statute. The plaintiff's argument amounts to that it can sit, it can wait, and this will include also the Justice Department, and hold an axe behind its hand even though it knew unequivocally what SEPTA was going to do and then after spending the millions of dollars bring it out and say you did it wrong and the Justice Department and plaintiffs will say well that will help settlement. That's number one. No way. Isn't that what Congress said? Said where? Congress said you wait until completion. It did not say that. Let's assume for a minute that I accept the imprudence of that result. Congress says you wait until completion. The statute doesn't say that it shall be considered discrimination for a public entity to fail to propose to make alterations or fail to plan to make alterations. It says fail to make and then later on in the same sentence it says upon completion. Well that's presuming several things. One, that the final clause in the alteration provision is modifying the word discrimination. I agree with it. We agree with the district court in the fine. That is not the case. It is the last stand of seeing and it modifies what is right before. Secondly, if you read and I'm going to get past this section in a minute. If you read section 12-147A there is the conjunctive or. So there are two things that can happen here. You can improperly build it or you can fail to ensure that it's properly built and that is accomplished by your planning. It takes architects. It takes others to put together a plan and just as SEPTA did, it made very clear that this plan is not including and this build-out is not including an elevator. So you think it would be wasteful to have the project completed and then have the remedy undo the project? It would turn on its head the entire body of law that has looked at disparate treatment cases and has said and they can see this is a disparate treatment case and has held Rick, Chardin, Wilson v. Garcia that the discriminatory act is when the cause of action accrues the harmful effects is not the time. Well, I'm asking about this statute and the policy implications of this statute. You've made a policy argument that it would be economically wasteful and imprudent for the action to be brought after the construction was completed, correct? We certainly agree with that. We've also argued... When did the statute expire under your theory? Two years. In relation to completion of the project, when did the statute expire? On November 20, 2000, it was unequivocal that SEPTA was going forward as it had described. The city wrote a letter to Mr. Pessoir or excuse me, Mr. Pessoir wrote a letter to Mr. Gold saying if you disagree, please be expeditious in your suit because we're on the way, contracts are lit, we have a grant that has an 18-month finisher, we will lose our money. Nothing could be more imminent. Two years from that point... With all due respect, let me ask the question again because I don't think you've answered it. Under your theory of the case, in relation to the completion of the project, when did the statute of limitations expire? We argued it would have been August 2007 although the court found that the claim accrued in November 2002. Excuse me, 2000. So that would mean two years from the date of November 2000. Let me try one more time. In relationship to the completion of the project... Of this particular project. November 2002? No. I'm not looking for a date. I'm looking for... Did the statute expire before the completion of the project or after the completion of the project? Before. It didn't expire three months after the completion of the project, under your theory? No. The claim accrued when DIA knew that SEPTA was proceeding, contracts were lit, the case was read, we're breaking ground. What about under District Judge's holding, when did the statute expire? I don't have the opinion in front of me so I can't tell you the precise date, although she did rule it was untimely. But as we argued, the claim accrued, and as Wilson teaches, it's when you knew two years subsequent to that date in this particular case, it's over. When was the project completed? The project was completed, I believe, in the summer of 2002. Approximately. And the statute expired November 2002? Yes. So the statute expired some months after project completion? No, then I have it wrong. No, you've got it right. It's November 2002 was when the statute expired. But you just said completion was summer of 2002. I meant 2003. Okay. 2003, I believe that was it, on the 15th and Market Street station. Yeah. Or in the courtyard. So you're saying if I'm in a wheelchair and I want to use that station, I'm injured nine months before the station even opens for business? Under federal law, you are. This case is no different than all other cases that have been treated by the Supreme Court under the disparate treatment analysis, which is, when did you know? Not the consequences. And you mentioned Chardon. Chardon knew, I believe, Rick's letter in one year, I think Chardon was two years. Consequences. Act, discriminatory intent here for Chardon, two years later, the consequences. Our Supreme Court had no problem whatsoever pointing out that the statute accrued when Chardon knew. And I think what's really critical is the argument that the government makes that things could have changed was rejected, resoundingly rejected, by the court in Chardon. Now, we also argued, if there are no further questions at this point. Yes, there are. If it is the knowledge of the particular disabled person that triggers the statute, haven't you put yourself in a much more uncertain position than you would under their construction? Not at all. Because there are all sorts of disabled people out there that undoubtedly still don't know about that, and they may, two years from now, four years from now, arrive at the station and find out they're discriminated against. Well, if you take that argument to its logical conclusion, there may never be repose on a construction project. It would take nothing for an advocacy group to take people into various states, projects are concluded, and say, I didn't know, and now that I do... But doesn't that support the government's position? The government's position is the two-year clock begins to run the date the ribbon is cut, and if you move to Philadelphia two years and a day after the ribbon is cut, you're too late. Doesn't support their position. This was publicly aired, publicly produced, a grant that we applied to the city. We received a permit. This was public works, and frankly, if federal law is such that somebody could come in after that, I think the Supreme Court would be quite surprised. This was known. The fact that you were in California, the fact that somebody else didn't know, will not stop that clock. And I have read no case in the construction area, and we have briefed you on the 1983 construction cases, that said, well, if you come in, and you didn't know, even though it was 20 years ago, we're going to let you challenge it. That would be the worst policy ever. In fact, it would tell me that there is no construction project that is free from riposte in this country under either the ADA, or if it faces a 1983 challenge. That cannot be the policy. It could not be a better policy. But isn't that what you're arguing for? No, I'm arguing that the statute... I know you're not, but that's the very argument you're making. No, I'm not. You're saying the statute is triggered when the discriminating party is notified, receives notice, or not. If you... Okay, I'll run that for you. If we decide, if we affirm the district court, you've successfully defended this suit against the plan, the impelments. Yes. Somebody moves in here next month from Pittsburgh. Yes. And is disabled. Yes. And they go down to that station. Yes. They cannot access the 15th and Market Street station because there's stairs, and there's an escalator, so there's no elevator. Yes. And they bring suit against you. No. And they say, you know, we found out when we went in March of 2008, and there was no elevator. Understood. Now, under your argument, they have two years. No, they don't. It was knew or should have known. Well, how could they have known? Take a look at the public documents. They didn't live there, they had no plan. They had no plan on ever using the Market-Frankfurt line because they get transferred. They get transferred from the Veterans Administration in Pittsburgh to the VA in Philadelphia. Their circumstances on a knew or should have known standard cannot change the outcome on a piece of public work like this where it's been vetted there's an agreement from the city to allow you to go forward. If that were the case and the knew or should have known standard would not apply, then I suppose the law that has been developed by the Supreme Court would be of no use. And I would suppose that all those 1983 cases must have been or could be wrong. I don't think that's what it is. It's not a new. I think the problem with your argument could potentially be that you're trying to make an analogy under Chardon to an employment discrimination case that involves an individual. And here you have a form of disability discrimination that involves a class. You have two different situations. And I think the point that I tried to make and perhaps the other judges on the panel have indicated is there is a bit of a conflict as to how long this statute would continue to run for the entire class. Okay. May I address that? Sure. On two grounds. The Congress when it enacted the statute did not expressly state that this will continue to run so long as somebody shows up and didn't know. Right. They said it runs two years from the date of completion. No, they didn't. I don't agree with your reading of that. May I finish my argument? Sorry. My apologies. I couldn't resist. I apologize. I know. I don't read it that way for any number of reasons. And we can get into that too. And so they didn't say that. What happens then? And they didn't adopt the Fair Housing Act provisions which could have given you upon the last completion of construction the last brick would be here whereas in Fair Housing it's the last housing unit. They didn't do that either. They did what Congress was entitled to they did what they were entitled to do and what they could expect which would be absent statute of limitations this case will be governed just as every other case like it relevant to it has been governed which is the body of the law that I've been talking about they could have as they did in the Fair Housing cases they could have done what you're telling me that they wanted to do they didn't and I think if this court would hold that way then you with all due respect would be legislating for Congress by providing an accrual period that has no limitation and the logical extension of that is you have just legislated and as we put in our brief Congress legislates courts should stay away off of that particular line now Mr. Creswell let me just try to make sure I understand your position does the clock begin to run when the blueprints are drafted when the initial approval occurs the final approval which stage of the planning process starts the clock? let me say in this case and then I'll say because it could be different in many cases but in this particular case plans approved contracts in place contracts led tight time frame we're going to break ground and that is an accrued claim under federal law which one? what do you mean? which one of those starts the statute running? I'm not saying you should look at it in that fashion I think you need to look at when is the claim ripe and imminent if you have at your architect's office a set of blueprints that doesn't have an escalator because you don't think you need one and you haven't hired a GC and you don't have a permit for example in a case like that you don't have a permit and you don't even have zoning that's not ripe where in the statutory language do you see the basis for making distinctions like that case by case what? I'm sorry that's for the courts to draw the statute doesn't have to draw a bright line you do that every day is this a ripe case for adjudication? is this an article 3 case that we can accept for adjudication on the issue or has the controversy been not sufficiently drawn or factually developed? I think we understand your position on that let me ask just one more question your time is up your friends across the way say we don't put them in a difficult position we didn't put them in a difficult position if the public entity has any questions or doubts about whether they're complying with the statute and it's called to their attention they can bring a declaratory judgment action before they're committed to all of this stuff what's your response to that? SEPTA had no doubt that it was correct this was not an alteration SEPTA had no doubt that it was correct this was not an alteration this was part of a key station build out that already had two elevators SEPTA had no need to analyze it legally so you're not in a problem because you're going to win on the merits that's what you're saying? that's why SEPTA moved forward because it felt it was correct under law I'm sure the judiciary doesn't want to have cases presented to it every time SEPTA might have it an inch and down and I just might also say just one more point that under the theory of the plaintiffs and the government there is no statute of limitations as you pointed out it's indeterminate if your project takes six years and someone comes along and says well we know about it as this group did and now we're going to sue and on this particular project down the street it was eight years and now we're going to sue for four years that can't be federal policy if congress wanted it they would have said it I always say that if this court holds that we have a statute of limitations without repose and we're not accruing it when you knew or should have known especially in this situation where SEPTA was threatened to sue then I don't know where there's going to be any certainty and the supreme court and Wilson pointed out very clearly we're working to obtain certainty and this is why they took 14 different courses of action Mr. Prenzel, thank you we understand your position Thank you Mr. Gold Very quickly, Judge Hardeman the 11-20-2000 letter there was enormous amount of negotiations and the oral agreement occurred subsequent to that letter first second you asked Mr. Prenzel a question under their theory and the judge's federal court's theory that the construction was completed in August of 2002 the two-year statute of limitations would have expired in 11-02 three months afterwards because of the letter written in November 2000 that's clearly what the district judge and the opposing counsel's argument is in terms of the discovery rule Judge Stapleton and Judge Fisher the Pittsburgh client exists the Pittsburgh disabled person exists we've met him and he's come from Pittsburgh he's living in Philadelphia now and he's dumbfounded how he can't use he asked a question when did they build the new entrance at 15th street but he had no knowledge you'd have to admit though that that person is out of luck if they come over to you not under the discovery rule I thought your theory of the case is their theory as I understand it relies most heavily on pragmatism better to prevent the millions of being expended unnecessarily rather than having them spent only to be undone so I thought your position was in line with the government  and clarity and pragmatism let's focus on the fact that we know when the clock starts running i.e. the date of completion and we know when this clock stops two years later no we know when the clock begins upon completion clearly 8.02 that's the bottom line that's when congress said it if someone at that point knows or should have known at that point then it's a two year statute of limitations Judge Fisher asked a question about Deceptive's argument and that's what I was responding to let's assume someone doesn't have any knowledge of this construction moves into Philadelphia in 2007 under your theory of the case Judge Harden was trying to point out under your theory of the case they've got two years from completion our plaintiffs knew about it upon completion the discovery rule began upon completion we had to file it but so would anybody moving in from the outside be warned upon completion we're not asking you to reach that I understand that that just seems pretty aggressive that something could be in place for 20 years somebody moves in there's a whole body of law then we're going to redo the law the irony is your theory of the case cuts them off I posit the possibility that under Septa's theory of the case that claim may still be alive that's not before us that is not before us and we're not asking you to reach that that's the ongoing discrimination the continuing discrimination and when is it triggered that's not this case just in conclusion 21 years ago Judge Mansman issued his own decision in D.I.A. vs. Sykes for Mr. Kretzels to stand up together and say they made that decision because it's not quote unquote an alteration that triggers it we suggest this panel do exactly what Judge Sykes Judge Greenberg and Judge Mansman did they looked at the photos and the photos of 15th Street and 15th and Market and less than ever shows extensive alterations that clearly unequivocally affected usability and the final results of people with disabilities can't use it thank you very much thank you Mr. Goldman and we thank you all counsel for a very well argued case and there's no there's no sir rebuttal no no commentary thank you Mr. Kretzels we'll take the matter under advisement thank you is Carter's counsel here yes I think so